**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**
───────────────────────────────────────

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

        **v.**                  **07-CR-0228S(Sr)**

**YAYA AKEEB ALESH,**

        **Defendant.**
───────────────────────────────────────

## REPORT, RECOMMENDATION AND ORDER

This case was referred to the undersigned by the Hon. William M. Skretny, in accordance with 28 U.S.C. § 636(b)(1), for all pretrial matters and to hear and report upon dispositive motions.

## PRELIMINARY STATEMENT

The defendant, Yaya Akeeb Alesh ("the defendant"), is charged in a multi-count indictment with having violated Title 21 U.S.C. §§ 963 (Count 1), 846 (Counts 2 and 3), 843(b) (Count 4) and Title 18 U.S.C. §§ 2 (Count 4) and 1001(a)(2) (Count 5). (Docket #1).  He has filed multiple motions to suppress evidence consisting of the following: (1) "Motion to suppress evidence based on unconstitutional arrest without probable cause;" (2) "Motion to suppress evidence obtained from warrantless vehicle search for which no exception to the warrant requirement applies;" (3) "Motion to suppress evidence of warrantless search of package at Kennedy airport without reasonable cause to believe that contraband was present;" (4) "Motion to suppress

seizure/opening of package in Buffalo, New York by law enforcement without a warrant;" and (5) "motion to suppress statements."  (Docket #8).

The government has filed a response in opposition to these motions. (Docket #13).

Each of the aforesaid motions shall be separately addressed herein.

## **FACTS**[1]

On August 21, 2007, a package mailed from Lima, Peru with an address for delivery in Buffalo, New York was intercepted by U.S. Customs officials at JKF Airport in New York City and searched by Customs officials.  The package was found to contain a quantity of cocaine.  It was resealed by Customs officials and placed in the United States mail stream for delivery to the addressee on the package, to wit, "Jerry Cockerton, 39 Plymouth Avenue, Buffalo, N.Y."

Upon arrival of the package in the Buffalo, New York postal facility on August 22, 2007, United States Postal Inspectors and United States Customs officers created a new package for deliver to "Jerry Cockerton, 39 Plymouth Avenue, Buffalo, N.Y." and inserted "sham" or "fake cocaine" in said package.

---

[1] The facts as set forth herein are taken from the papers submitted by the defendant and the government as well as the stipulation entered into in open court by defense counsel and the government's attorney on March 20, 2008.

On August 23, 2007, Postal Inspector Wiechec, while wearing a U.S. Postal Delivery Uniform, approached the residence at 39 Plymouth Avenue, Buffalo, New York at approximately 11:27 a.m. for purposes of delivering the package containing the "sham" or "fake cocaine" addressed to "Jerry Cockerton" at the address. Inspector Wiechec observed the defendant standing in the doorway of the rear apartment at 39 Plymouth Avenue and stated: "I have a package for Jerry Cockerton" to which the defendant responded in substance: "I am Jerry Cockerton."  The defendant then signed the postal receipt acknowledging delivery of the package as "Jerry Cockerton" and took possession of the package from Inspector Wiechec.  While this was occurring, government agents were secretly keeping the premises at 39 Plymouth Avenue under surveillance.  Inspector Wiechec left the premises and approximately two minutes after the delivery of the package, the defendant was observed walking back and forth on the driveway of 39 Plymouth Avenue without the recently delivered package.  There was an automobile parked in the driveway at 39 Plymouth Avenue, but the defendant did not enter this automobile while being observed by the government agents.  However, as the defendant continued his walk in the driveway heading towards the parked automobile, the government agents intercepted him and placed him under arrest while he was a distance of three feet away from the automobile.[2]

---

[2] The parties have stipulated that the defendant was arrested before he had entered the automobile and that he had been out of the automobile for approximately fifteen (15) minutes before he was arrested.

Upon being arrested, the agents conducted a search of the defendant's person which revealed identification documents for a "Jerry Cockerton" along with keys for apartment number 2 at 39 Plymouth Avenue, Buffalo, New York.  Agents then searched the automobile parked in the driveway at 39 Plymouth Avenue which belonged to the defendant and retrieved a Canadian Passport that identified the defendant as Yaya Akeeb Alesh.  At this point in time, the defendant stated that he was Yaya Akeeb Alesh and not "Jerry Cockerton" and that he purchased the false "Jerry Cockerton" documents from someone in Canada for $200.

After allegedly being given a Miranda warning (*Miranda v. Arizona*, 384 U.S. 436 (1966)) by the agents, the defendant stated that he had been requested by an individual that he only knew as "John" to use an apartment in the United States for purposes of accepting delivery of a package that would contain "clothes" that was coming from Peru in return for "John" paying him $1,200 to do this.  Defendant rented the apartment at 39 Plymouth Avenue, and on August 20, 2007, "John" called him and told him that the package would be arriving on August 23, 2007.

The agents asked the defendant if they could enter his apartment at 39 Plymouth Avenue and search it.  The defendant allegedly "consented" to such entry and search by telling the agents, "go ahead, there is nothing in there."  A search of the apartment resulted in the finding of a rental agreement containing the name "Jerry Cockerton."  A search was conducted of an unlocked closet located in a common hallway just outside of apartment number 2 at 39 Plymouth Avenue, and the agents

found and seized the package addressed to "Jerry Cockerton," 39 Plymouth Avenue,

Buffalo, New York which contained the "sham" or "fake cocaine."  At the time it was

found, the package appeared to not have been opened.


## DISCUSSION AND ANALYSIS

Since the validity of the searches at issue as well as the arrest of the

defendant are founded on the initial customs search at the JFK airport on August 21,

2007, that issue will be addressed first with the subsequent issues addressed

chronologically from that initial event.


**A.     The JFK Airport Search:**

The defendant argues that since the "package" was "originally searched at

JFK without a warrant and without reasonable cause to believe that contraband was

contained in it," the "narcotics must be suppressed"  (Docket #8, p. 8), "as must all fruit

of the poisonous tree - *i.e.*, all evidence - that flowed from this unconstitutional search."

(Docket #8, p. 8).  This argument of the defendant is totally without legal merit and is

rejected.  As the United States Supreme Court has ruled:

> Border searches . . . from before the adoption of the Fourth
> Amendment, have been considered "reasonable" by the
> single fact that the person or item in question had entered
> our country from outside.  There has never been any
> additional requirement that the reasonableness of a border
> search depended on the existence of probable cause.  This
> longstanding recognition that searches at our borders
> without probable cause and without a warrant are
> nonetheless "reasonable" has a history as old as the Fourth

Amendment itself.

\*   \*   \*

It is clear that there is nothing in the rationale behind the border-search exception which suggests that the mode of entry will be critical. *United States v. Ramsey*, 431 U.S. 606, 619-620 (1977).

Therefore, it is RECOMMENDED that defendant's motion to suppress on this basis be DENIED.

### B.   The Buffalo, New York Postal Office Search And Seizure:

The defendant argues that there was no "exigency" that required the opening of the "package" and the seizure of the contraband without a warrant.  As a result, this "additional warrantless search and seizure is unconstitutional" and therefore, "the cocaine, on this basis, must be suppressed, as must the evidence subsequently obtained as a result of the unconstitutional search."  (Docket #8, pp. 8-9).

This argument of the defendant is without legal merit as well.  "The Fourth Amendment is implicated only if the authorities use information with respect to which the expectation of privacy has not already been frustrated."  *United States v. Jacobsen*, 466 U.S. 109.117 (1984).

"The reasonableness of an official invasion of the citizen's privacy must be appraised on the basis of facts as they existed at the time the invasion occurred."  *Id.* at

115.

The "search" of the package on August 22, 2007 by U.S. Postal

Inspectors and U.S. Customs Officers was subsequent to the valid border search by

government agents at JFK on August 21, 2007.  As a result, the government agents in

Buffalo possessed actual knowledge as to the contents of the "package" by reason of

what was learned in the search of the "package" on August 21, 2007.  Any expectation

of privacy that the defendant may have had when the "package" arrived in Buffalo, New

York on August 22, 2007 had in fact been frustrated by the legal border search on

August 21, 2007.

> The Fourth Amendment protects legitimate expectations of
> privacy rather than simply places.  If the inspection by police
> does not intrude upon a legitimate expectation of privacy,
> there is no "search" subject to the Warrant Clause.  See
> Walter v United States, 447 US 649, 663-665, 65 L Ed 2d
> 410, 100 S Ct 2395 (1980) (Blackmun, J., dissenting).  The
> threshold question, then, is whether an individual has a
> legitimate expectation of privacy in the contents of a
> previously lawfully searched container.  It is obvious that the
> privacy interest in the contents of a container diminishes with
> respect to a container that law enforcement authorities have
> already lawfully opened and found to contain illicit drugs.  No
> protected privacy interest remains in contraband in a
> container once government officers lawfully have opened
> that container and identified its contents as illegal.

*Illinois v. Andreas*, 765, 771 (1983).

The opening of the "package" by government agents on August 22, 2007

and removing the contraband therefrom merely constituted a re-examination of the

contents of the "package" based on information received from their government

colleagues at JFK.  In essence, the agents in Buffalo, New York learned nothing more

about the contents of the "package" on August 22, 2007 than what had been known by

the government on August 21, 2007.  As a result, the "search" of the "package" on

August 22, 2007 did not infringe on any legitimate expectation of privacy and hence

was not a "search" within the meaning of the Fourth Amendment.  *United States v.*

*Jacobsen, supra* at 120; *see also United States v. Corral*, 970 F.2d 719 (10th Cir. 1992).


The removal of the cocaine from the "package" by the government agents

on August 22, 2007 and creating a new package for delivery to the addressee did not

constitute an unlawful "seizure" in violation of the Fourth Amendment.  The government

agents at JFK made a determination that the "package" contained cocaine, which

information was conveyed to the agents in Buffalo, New York.  "[I]t is well-settled that it

is constitutionally reasonable for law enforcement officials to seize 'effects' that cannot

support a justifiable expectation of privacy without a warrant, based on probable cause

to believe they contain contraband."  *United States v. Jacobsen, supra* at 121-122.  In

the case at bar, the agents had more than probable cause; they had virtual certainty, if

not actual knowledge, as to the existence of contraband in the "package" at issue and,

therefore, had a legal right to seize it.


"The simple act of resealing the container to enable the [agents] to make

a controlled delivery does not operate to revive or restore the lawfully invaded property

rights."  *Ilinois v. Andreas, supra* at 771.

Therefore, it is RECOMMENDED that defendant's motion to suppress on this basis be DENIED.

### C.   Defendant's Claim Of An Illegal Arrest:

The defendant argues that "the information known to the agents at the time they effectuated [his] warrantless arrest [did] not rise anywhere near the level of probable cause that is constitutionally required for an arrest" because "the agents had no proof or information that [the defendant] knew that the parcel had once contained cocaine" or that the defendant "tried to open the parcel."  The defendant asserts that the agents "had no proof of anything other than he accepted a parcel for Jerry Cockerton, said he was Jerry Cockerton, and that the parcel had once contained cocaine" and therefore, "there was not probable cause to arrest" the defendant.  As a result, the defendant claims that "all evidence (items obtained from his person; items obtained from the car; items obtained from the apartment; statements; Mr. Alesh's identity) are (sic) fruit of the poisonous tree under *Wong Sun* and must be suppressed." (Docket #8, p. 6).

This argument of the defendant is also found to be without legal merit. "Whether [an] arrest [is] constitutionally valid depends in turn upon whether, at the moment the arrest was made, the officers had probable cause to make it - whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing

that the petitioner had committed or was committing an offense." *Beck v. State of Ohio*, 379 U.S. 89, 91. "The quantum of information which constitutes probable cause - evidence which would 'warrant a man of reasonable caution in the belief' that a felony has been committed, (citation omitted), must be measured by the facts of the particular case." *Wong Sun v. United States*, 371 U.S. 471, 479 (1963). The Court of Appeals for the Second Circuit has stated:

> Probable cause exists if a law enforcement official, on the basis of the totality of the circumstances, has "knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested. *Panetta v. Crowly*, 460 F.3d 388, 395 (2d Cir. 2006)."

*United States v. Howard*, 489 F.3d 484, 491 (2d Cir. 2007).

The arresting officers in this case certainly had "knowledge or reasonably trustworthy information" to believe that a package containing contraband, to wit, cocaine, had been shipped by mail from Lima, Peru for delivery to a "Jerry Cockerton" at "39 Plymouth Avenue, Buffalo, New York" based on the interdiction that had occurred on August 21, 2007 at the JFK Airport as well as their search of the "package" on August 22, 2007 in Buffalo, New York. On August 23, 2007, the defendant was observed standing in the doorway of the premises located at 39 Plymouth Avenue, Buffalo, New York by Postal Inspector Wiechec. Postal Inspector Wiechec, while wearing a postal delivery uniform, approached the defendant with the "package" containing the sham cocaine for purposes of delivering the "package" in question to "Jerry Cockerton," the named addressee on the "package," and stated: "I have a

package for Jerry Cockerton" to which the defendant responded in substance, "I am

Jerry Cockerton."  The defendant then signed the postal receipt acknowledging delivery

of the package as "Jerry Cockerton" and took possession of the package from Inspector

Wiechec.

This was a "controlled delivery" of a package that had originally contained

contraband, and the language of the United States Supreme Court in *Illinois v.*

*Andreas, supra* is applicable to the case at bar wherein the Court stated:

> The lawful discovery by common carriers or customs officers
> of contraband in transit presents law enforcement authorities
> with an opportunity to identify and prosecute the person or
> persons responsible for the movement of the contraband.
> To accomplish this, the police, rather than simply seizing the
> contraband and destroying it, make a so-called controlled
> delivery of the container to its consignee, allowing the
> container to continue its journey to the destination
> contemplated by the parties.  The person dealing in the
> contraband can then be identified upon taking possession of
> and asserting dominion over the container.

> The typical pattern of a controlled delivery was well
> described by one court:

>> "Controlled deliveries of contraband apparently
>> serve a useful function in law enforcement.
>> They most ordinarily occur when a carrier,
>> usually an airline, unexpectedly discovers what
>> seems to be contraband while inspecting
>> luggage to learn the identity of its owner, or
>> when the contraband falls out of a broken or
>> damaged piece of luggage, or when the carrier
>> exercises its inspection privilege because
>> some suspicious circumstance has caused it
>> concern that it may unwittingly be transporting
>> contraband.  Frequently, after such a
>> discovery, law enforcement agents restore the

> contraband to its container, then close or
> reseal the container, and authorize the carrier
> to deliver the container to its owner.  When the
> owner appears to take delivery he is arrested
> and the container with the contraband is seized
> and then searched a second time for the
> contraband known to be there."  United States
> v Bulgier, 618 F2d 472, 476 (CA7), cert
> denied, 449 US 843, 66 Led 2d 51, 101 S Ct
> 125 (1980).

*Id*. at 769-770.

When the defendant identified himself as "Jerry Cockerton" to Postal

Inspector Wiechec and signed his name "Jerry Cockerton" on the postal receipt

acknowledging receipt of the "package," the agents had probable cause to arrest him

based on the totality of the circumstances known to them.  "The validity of the arrest

does not depend on whether the suspect actually committed a crime" since "the kinds

and degree of proof and the procedural requirements necessary for a conviction are not

prerequisites to a valid arrest."  *Michigan v. De Fellippo*, 443 U.S. 31, 36 (1979); *see*

*also United States v. Delossantos*, 536 F.3d 155 (2d Cir. 2008).  As the United States

Supreme Court pointed out in footnote 3 of its decision in *Illinois v. Andreas, supra*, this

is not to say that the taking possession of the package establishes guilt of illegal

possession or importation of contraband.  The defendant is certainly free to offer

evidence, as he claims in his motion to suppress, that the nature of the contents were

unknown to him or that he never opened the "package."  The defendant is also free to

contest the claim that he identified himself as "Jerry Cockerton" to the postal inspector.

However, these are evidentiary issues to be raised and resolved at trial and do not

provide a sufficient legal basis to support his claim that he was illegally arrested.

Since the agents had probable cause to arrest the defendant, they also had a right to search his person after placing him under arrest. *United States v. Robinson*, 414 U.S. 218, 224 (1973). As a result, it is RECOMMENDED that defendant's motion to suppress this evidence be DENIED.

### D.    The Search Of Defendant's Automobile:

As previously indicated, the parties have stipulated that the defendant was arrested before he had entered the automobile parked in the driveway at 39 Plymouth Avenue and that he had vacated that automobile approximately fifteen (15) minutes prior to being arrested. The defendant had merely been observed walking back and forth on the driveway at 39 Plymouth Avenue and he was approximately three (3) feet away from the automobile when he was taken into custody by the agents. Thereafter, the agents searched the automobile and seized a Canadian Passport that identified the defendant as Yaya Akeep Alesh. However, before the defendant was given a Miranda warning (*Miranda v. Arizona*, 384 U.S. 436 (1966)), he volunteered, since no interrogation of defendant had commenced at this point, that he was Yaya Akeep Alesh and not "Jerry Cockerton" and that he had purchased the false "Jerry Cockerton" documents from someone in Canada for $200.

This issue of automobile searches after a defendant has been arrested and taken into custody has proven to be a troublesome Fourth Amendment issue over the years.

> A search or seizure without a warrant as an incident to a
> lawful arrest has always been considered to be a strictly
> limited right.  It grows out of the inherent necessities of the
> situation at the time of the arrest.  But there must be
> something more in the way of necessity than merely a lawful
> arrest."  *Trupiano v. U.S.*, 344 U.S. 699, 705 (1948).

*Chimel v. California*, 395 U.S. 752, 758 (1969).

Admittedly, the case of *New York v. Belton*, 453 U.S. 454 (1981) is cited

as the landmark case authorizing a search of a vehicle upon the arrest of the occupants

of that vehicle using "safety" of the arresting officers as the justification for such a

search.  Nevertheless, the court in *Belton* recognized the difficulty in defining a rule or

principle that could be uniformly applied when it stated:

> While the *Chimel* case established that a search incident to
> an arrest may not stray beyond the area within the
> immediate control of the arrestee, courts have found no
> workable definition of "the area within the immediate control
> of the arrestee" when that area arguably includes the interior
> of an automobile and the arrestee is its recent occupant.

*Id*. at 460.

In Footnote 3 of its decision, the Court expressly explained that

> Our holding today does no more than determine the
> meaning of *Chimel's* principles in this particular and
> problematic content.  It in no way alters the fundamental
> principles established in the *Chimel* case regarding the basic
> scope of searches incident to lawful custodial arrests."

*Id*. at 460.

-14-

Nevertheless, twenty-three years later, the United States Supreme Court found itself still struggling with the concept of searching an automobile after its occupants had vacated the vehicle and were then arrested as reflected in its seriatim opinions in *Thornton v. United States*, 541 U.S. 615 (2004).

Although the majority of the court "conclud[ed] that *Belton* governs even when an officer does not make contact until the person arrested has left the vehicle," it declined "to address petitioner's argument that the scope of *Belton* should be limited to "recent occupants" who are within "reaching distance" of the car. *Id.* at 617 and footnote 2 at 622. Nevertheless, the Court did recognize and acknowledge that "an arrestee's status as a 'recent occupant' may turn on his temporal or spatial relationship to the car at the time of the arrest and search" and that "recent" occupancy was a necessary element to justify a warrantless search of the vehicle "as an incident to the arrest." *Id.* at 622, 623.

In her concurring opinion, Justice O'Connor expressly stated her "dissatisfaction with the state of the law in this area" and her agreement with Justice Scalia's argument that "lower court decisions seem now to treat the ability to search a vehicle incident to the arrest of a recent occupant as a police entitlement rather than as an exception justified by the twin rationales of *Chimel v. California*, 395 U.S. 752, 23 L. Ed. 2d 685, 89 S.Ct. 2034 (1969)" which constitutes an "erosion [that] is a direct consequence of *Belton's* shaky foundation." *Id.* at 624.

-15-

Justice Stevens, with whom Justice Souter joins, clearly expresses the

dilemma created by *Belton* by stating:

> Unwilling to confine the *Belton* rule to the narrow class of
> cases it was designed to address, the Court extends
> *Belton's* reach without supplying any guidance for the future
> application of its swollen rule.  We are told that officers may
> search a vehicle incident to arrest "[s]o long as [the] arrestee
> is the sort of 'recent occupant' of a vehicle such as petitioner
> was here."  *Ante*, at 623-624, 158 L Ed 2d, at 915.  But we
> are not told how recent is recent, or how close is close,
> perhaps because in this case "the record is not clear."  325
> F3d 189, 196 (CA4 2003).  As the Court cautioned in *Belton*
> itself, "[w]hen a person cannot know how a court will apply a
> settled principle to a recurring factual situation, that person
> cannot know the scope of his constitutional protection, nor
> can a policeman know the scope of his authority."  453 US,
> at 459-460, 69 L Ed 2d 768, 101 S Ct 2860.  Without some
> limiting principle, I fear that today's decision will contribute to
> "a massive broadening of the automobile exception,"
> *Robbins*, 453 US, at 452, 69 L Ed 2d 744, 191 S Ct 2841
> (Stevens, J., dissenting), when officers have probable cause
> to arrest an individual but not to search his car.

*Id*. at 636.

It is this Court's opinion that the present Supreme Court has recognized

that there is a need to address this issue of temporal and spatial proximity of an

arrestee to a vacated vehicle that has been subjected to a search as an incident to an

arrest by its granting certiorari on February 25, 2008 in the case entitled *Arizona v. Gant*

( U.S. Sup. Ct. Docket #07-542) wherein the court defined the issue as follows:

> Does the Fourth Amendment require law enforcement
> officers to demonstrate a threat to their safety or a need to
> preserve evidence related to the crime of arrest in order to
> justify a warrantless vehicular search incident to arrest
> conducted after the vehicle's recent occupants have been

arrested and secured?"

For all intents and purposes, this is precisely the issue that is before this Court as to the search of the defendant's parked vehicle after he had been arrested and secured.  As previously stated, the parties have stipulated that the defendant had been out of his automobile for approximately fifteen (15) minutes before he was arrested, and at the time of his arrest, he was a distance of three feet away from his automobile.  Furthermore, the defendant had been under surveillance by the agents from the time that Postal Inspector Wiechec delivered the package to the defendant while he was standing inside the doorway of the rear apartment at 39 Plymouth Avenue.  The defendant never entered his automobile after the package in question had been delivered to him prior to his arrest.  He had been observed as merely walking back and forth on the driveway at 39 Plymouth Avenue immediately prior to being arrested.  In essence, he had the status of that of a pedestrian when arrested.  In his dissenting opinion in *Thornton v. United States, supra*, Justice Stevens opines that:

> The bright-line rule crafted in *Belton* is not needed for cases in which the arrestee is first accosted when he is a pedestrian, because *Chimel* itself provides all the guidance that is necessary.  The only genuine justification for extending *Belton* to cover such circumstances is the interest in uncovering potentially valuable evidence.  In my opinion, that goal must give way to the citizen's constitutionally protected interest in privacy when there is already in place a well-defined rule limiting the permissible scope of a search of an arrested pedestrian.  The *Chimel* rule should provide the same protection to a "recent occupant" of a vehicle as to a recent occupant of a house.

*Id.* at 636.

What the Supreme Court's decision will be in resolving the issue framed in *Arizona v. Gant* cannot be surmised with any certainty at this time.  Nevertheless, it is this Court's opinion that there will be a further narrowing or restriction on the holding in *Belton* in the context of "spatial proximity" to a vehicle after a "recent" occupant has been arrested and secured.

In deciding the issue relating to the search of the defendant's vehicle in the case herein, I find it unnecessary to address the element of "spatial proximity" since the resolution of the "temporal proximity" element is sufficiently dispositive of the issue for the reasons set forth herein.  As Justice Stevens pointed out, the Supreme Court has failed to provide any guidance as to "how recent is recent."  *Id.* at 636.  Webster's New College Dictionary (2007) defines "recent" as follows:

> emerge freshly, new, done, made etc. just before the present time;

Since the government has stipulated that the defendant had vacated the automobile in question approximately fifteen (15) minutes before he was arrested, I find that he was not a "recent" occupant of the vehicle in question at the time of his arrest and therefore, even under the principle espoused in *Belton*, the subsequent search of the defendant's automobile without a search warrant was not a valid search incident to an arrest.  Further, because the defendant had been arrested and taken into custody, and since there were numerous agents on the scene at the time of his arrest, the automobile could have been secured until such time as a search warrant authorizing a

search could have been obtained.  The facts and circumstances of this case are insufficient to support a claim of "exigent circumstances" thereby eliminating the need for a search warrant.  *See Coolidge v. New Hampshire*, 403 U.S. 443, 460-62 (1971).

Therefore, it is RECOMMENDED that defendant's motion to suppress the evidence seized from his automobile on August 23, 2007 be GRANTED.

**E.     The Alleged Statements Of The Defendant:**

The defendant alleges that "in response to *custodial* interrogation, defendant made statements to the federal agents" and appears to dispute any claim of waiver of his right to remain silent and a claim that "he understood the warnings (given his language limitations and poor English)."  (Docket #8, p. 9).

In response, the government asserts that the defendant has failed to present "facts in support of his claim."  (Docket #13, p. 11).

Although this Court was prepared to hold an evidentiary hearing on the issues raised by defendant in this motion and scheduled such hearing for March 20, 2008, counsel for the defendant and the government advised the Court on March 20, 2008 that they did not wish to go forward with such a hearing.  Instead, the parties, through their respective attorneys, entered into the aforesaid stipulation wherein it was agreed that the defendant had been arrested before entering his automobile parked in the driveway; that he had vacated that vehicle approximately fifteen minutes before he

was arrested; and that he was approximately three feet from the vehicle when he was arrested.  As a result, this motion to suppress the statements of the defendant was submitted on the papers filed.

The Court is relying on the contents of the sworn affidavit of Special Agent Merker sworn to August 24, 2007 and submitted to this Court in support of the Criminal Complaint filed against the defendant (07-M-98) (Docket #1) in resolving the issues raised by the defendant in this motion to suppress his statements.

In paragraphs "5" and "6" of his affidavit, Special Agent Merker states that the defendant "was approached by law enforcement and ultimately placed under arrest" and that "after his arrest [his] person was searched."  (07-M-98, Docket #1).  In paragraph "7" of his affidavit, Special Agent Merker states that "after searching defendant's person, agents searched the defendant's car and recovered a Canadian Passport that identified defendant as Yaya Akeeb Alesh" and that the "defendant ultimately admitted that he was in fact Yaya Akeeb Alesh and not 'Jerry Code Cockerton' and that he purchased the false documents from someone in Canada for $200." (07-M-98, Docket #1).  Thereafter, in paragraph "8" of his affidavit, Special Agent Merker goes on to state that the defendant was "advised of his 'Miranda' warnings" and made certain statements about accepting delivery of the package in question at 39 Plymouth Avenue.  (07-M-98, Docket #1).

Since there was no evidentiary hearing and because the attorneys for the parties herein failed to submit legal briefs addressing this issue in detail, the Court is compelled to address these legal issues *sua sponte*.

Having determined that the search of the defendant's automobile was an illegal search, the evidence consisting of the aforesaid Canadian Passport was improperly seized. The question then becomes one of whether the use of the Canadian Passport by the agents in confronting the defendant as to his identity immediately after arresting him and before giving him his *Miranda* warnings resulted in the alleged statements made by the defendant being "fruit of a poisonous tree" thereby necessitating suppression of such statements.

> [V]erbal evidence which derives so immediately from an unlawful entry . . . is no less the 'fruit' of official illegality than the more common tangible fruits of the unwarranted intrusion. Nor do the policies underlying the exclusionary rule invite any logical distinction between physical and verbal evidence.

*Wong Sun v. United States*, 371 U.S. 471, 485-486 (1963) (footnote and citation omitted).

It appears that the alleged statements of the defendant were made at the time he was shown his Canadian Passport and before he was given a *Miranda* warning by the arresting agents.

Based on the sworn statements of Special Agent Merker and the chronology in which they are reported in his affidavit of August 24, 2007 (07-M-98, Docket #1), I find that the defendant had been arrested and then was confronted by the agents with his Canadian Passport containing the identification of the defendant as Yaya Akeeb Alesh before he was given his *Miranda* warnings.  It is this Court's opinion that this confrontational use of the illegally seized passport constituted the functional equivalent of custodial interrogation before the defendant had been given *Miranda* warnings.

> [T]he term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.

*Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

The United States Supreme Court defines "incriminating response" as being "any response - whether inculpatory or exculpatory - that the prosecution may seek to introduce at trial."  *Id.* at 301, n. 5.

Thus the alleged statements elicited from the defendant prior to being given *Miranda* warnings, to wit, that he admitted that "he was in fact Yaya Akeeb Alesh and not Jerry Code Cockerton and that he purchased the false documents from someone in Canada for $200 (07-M-98, Docket #1), must be excluded as evidence at the trial of the defendant.

-22-

Therefore, it is RECOMMENDED that the defendant's motion to suppress his statements made prior to being given a *Miranda* warning after having been arrested be GRANTED.

The government asserts, however, that the defendant also made post-arrest statements after he had been given a *Miranda* warning.  (Docket #13, p. 4).  The defendant claims that these post-*Miranda* statements should be suppressed because there is a question as to "whether he understood the warnings (given his language limitations and poor English)" and he contests any claim by the government "that there was a knowing and voluntary waiver" of his rights.  (Docket #8, p. 9).

As stated earlier, the defendant chose to forego an evidentiary hearing which would have addressed this particular issue.  Since no hearing was conducted, the government argues that the defendant has failed "to satisfy his burden" of establishing "facts in support of his claim" (Docket #13, p. 11) and therefore his motion to suppress his statements made after he was given the *Miranda* warnings, as set forth in the affidavit of Special Agent Merker (07-M-98, Docket #1), should be denied.

In deciding this issue, the arguments of the government and the defendant are rejected for the real issue to be decided under the totality of the circumstances in this case is whether the alleged *Miranda* warning given by Special Agent Merker to the defendant sufficiently attenuated the taint of the illegal search of the defendant's automobile and seizure of his Canadian Passport with which he was

confronted by Special Agent Merker.  *Wong Sun v. United States, supra* at 488.


Special Agent Merker states in his affidavit (07-M-98, Docket #1, ¶ 8) the

following:

> 8.   After being advised of his "Miranda" warnings, defendant
> stated, in sum and substance, that he had recently been
> approached by a man he identified as "John" who had asked
> him to take delivery of a box of clothes.  "John" had asked
> him to use his apartment in the United States so that a
> package could be sent there from Peru.  "John" offered
> defendant $1,200 to accept the parcel.  Defendant agreed to
> do so.  Sometime thereafter, "John" paid him $1,200.  After
> these discussions, defendant rented the aforementioned
> apartment and waited to hear from "John."  "John" called
> defendant on Monday, August 20, 2007, and told him, in
> sum and substance, that the package would be arriving this
> week.  "John" called defendant again and advised that the
> package would be here on August 23, 2007.  Defendant
> then drove over to 39 Plymouth to accept receipt of the
> parcel and the events, as summarized above, unfolded.

Those statements of the defendant certainly constitute an "incriminating

response" to the actions of Special Agent Merker.  *Rhode Island v. Innis, supra* at 301,

n. 5.


In arguing to deny the defendant's motion to suppress these statements

of the defendant, the government appears to be resting on a claim that because a

*Miranda* warning was given to the defendant before he made the statements in

question, that act alone was sufficient to cause said statements to be voluntary and

admissible at trial.  Such a position is contrary to established law and is rejected.

> If Miranda warnings, by themselves, were held to attenuate the taint of an unconstitutional arrest, regardless of how wanton and purposeful the Fourth Amendment violation, the effect of the exclusionary rule would be substantially diluted.

> *   *   *

> The question whether a confession is the product of a free will under Wong Sun must be answered on the facts of each case.  No single fact is dispositive.  The workings of the human mind are too complex, and the possibilities of misconduct too diverse, to permit protection of the Fourth Amendment to turn on such a talismanic test.  The Miranda warnings are an important factor, to be sure, in determining whether the confession is obtained by exploitation of an illegal arrest.  But they are not the only factor to be considered.  The temporal proximity of the arrest and the confession, the presence of intervening circumstances, see Johnson v Louisiana, 406 US 356, 365, 32 L Ed 2d 152, 92 S Ct 1620 (1972), and, particularly, the purpose and flagrancy of the official misconduct are all relevant.  See Wong Sun v United States, 371 US, at 491, 9 L Ed 2d 441, 83 S Ct 407.  The voluntariness of the statement is a threshold requirement.  Cf. 18 USC § 3501 [18 USCS § 3501].  And the burden of showing admissibility rests, of course, on the prosecution.

*Brown v. Illinois*, 422 U.S. 590, 602-604 (1975).

As the United States Supreme Court stated in *Brown,*

> Wong Sun requires not merely that the statement meet the Fifth Amendment standard of voluntariness but that it be "sufficiently an act of free will to purge the primary taint." 371 US at 486, 9 L Ed 2d 441, 83 S Ct 407.  Wong Sun thus mandates consideration of a statements' admissibility in light of the distinct policies and interests of the Fourth Amendment.

*Id.* at 602.

Since I have already determined that the search of the defendant's automobile, and the seizure of his Canadian Passport therefrom, violated the defendant's Fourth Amendment rights, the government has the burden of proving that the taint created by that illegal search and seizure has been alleviated and that the post-*Miranda* statements made by the defendant were the product of a "sufficient act of free will [that] purge[d] the primary taint of the unlawful invasion."  *Id*. at 599.

I find that in viewing the totality of the circumstances in this case, the government has failed to present anything that would justify a conclusion that such taint has been "purged."  Nor can it be concluded that there were intervening circumstances that caused the taint to be attenuated.  In reading Special Agent Merker's affidavit (07-M-98, Docket #1, ¶s 7 and 8), it is this Court's view that the actions of the arresting officers on the scene constituted one continuous action of arresting the defendant, immediately searching his vehicle upon such arrest, seizing the Canadian Passport from the vehicle and confronting the defendant with same which occurred in a matter of a few minutes.  As a result, it is RECOMMENDED that defendant's motion to suppress his post-*Miranda* statements be GRANTED.

### F.    Defendant's Motion To Suppress The Evidence Seized From The Premises At 39 Plymouth Avenue, Buffalo, New York:

The defendant argues that "given the lack of probable cause [for his arrest], . . . items from the apartment . . . must be suppressed."  (Docket #8, p. 6).  In

response to this claim by the defendant, the government appears to be relying on its

claim that the defendant "consented" to the search of his apartment wherein it states:

> After his arrest, defendant was asked by agents if they could
> look in his apartment and defendant stated, in sum and
> substance, "Go ahead, there is nothing in there."

(Docket #13, p. 5; *see also* affidavit of Special Agent Merker, 07-M-98, Docket #1, ¶ 9).

The defendant's claim that the evidence seized from the premises at 39

Plymouth Avenue constitutes "fruit of a poisoned tree" because his arrest was illegal is

rejected for the reasons set forth above finding the arrest of the defendant to be valid.

> It is well settled under the Fourth and Fourteenth
> Amendments that a search conducted without a warrant
> issued upon probable cause is '*per se* unreasonable. . .
> subject only to a few specifically established and well-
> delineated exceptions.' (citations omitted).  It is equally well
> settled that one of the specifically established exceptions to
> the requirements of both a warrant and probable cause is a
> search that is conducted pursuant to consent (citations
> omitted).

*Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973).

This principle was reaffirmed by the United States Supreme Court in

*Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990) wherein it stated:

> The Fourth Amendment generally prohibits the warrantless
> entry of a person's home, whether to make an arrest or to
> search for specific objects (citations omitted).  The
> prohibition does not apply, however, to situations in which
> voluntary consent has been obtained, either from the
> individual whose property is searched, *see Schneckloth v.*

*Bustamonte*, 412 U.S. 218, 36 L Ed.2d 854, 93 S.Ct. 2041
(1973), or from a third party who possesses common
authority over the premises, *see United States v. Matlock,
supra*, at 171, 39 L.Ed.2d 242, 94 S.Ct. 988.

The Court went on to state:

As with other factual determinations bearing upon search
and seizure, determination of consent to enter must "be
judged against an objective standard: would the facts
available to the officer at the moment. . . 'warrant a man of
reasonable caution in the belief'" that the consenting party
had authority over the premises? (citation omitted).  If not,
then warrantless entry without further inquiry is unlawful
unless authority actually existed.  But if so, the search is
valid.

*Id.* at 188, 189.

Since the government is relying on the defendant's "consent" for

upholding the search of his apartment and the seizure of evidence therefrom, to wit, "a

rental agreement containing the name 'Jerry Cockerton'" and the search of the

"unlocked closet in a common hallway outside Apartment 2" which resulted in the

seizure of "the parcel containing sweaters and the 'sham' cocaine."  (07-M-98, Docket

#1), ¶ 9), it has the burden of establishing the validity of such "consent to search."

*Schneckloth v. Bustamonte, supra* at 222; *Bumper v. North Carolina*, 391 U.S.  543,

548 (1968); *Florida v. Royer*, 460 U.S. 491, 497 (1983).

Because the defendant failed to submit an affidavit in support of his

motions to suppress and failed to expressly address the claim by the government that

he consented to the search of his Apartment at 39 Plymouth Avenue on August 23,

-28-

2007, and since the defendant decided not to go forward with an evidentiary hearing on the issues raised in his motions to suppress, I can only conclude that the defendant does not contest the voluntariness of his "consent to search" his apartment and does not contest the sworn statement of Special Agent Merker wherein he states that after the defendant was arrested, he "was asked by agents if they could look in his apartment and [the] defendant stated in sum and substance, 'Go ahead, there is nothing in there.'" (07-M-98, Docket #1, ¶ 9).

The fact that the defendant was under arrest and in custody at the time he gave his consent to search, does not by itself cause the "consent to search" to be involuntary. *United States v. Watson*, 423 U.S. 411, 424 (1976); *United States v. Garcia*, 56 F.3d 418, 423 (2d Cir. 1995).

In determining whether a consent to search is valid or not, the "totality of the circumstances must indicate that it was voluntarily given." *United States v. Davis*, 967 F.2d 84, 86 (2d Cir.), *cert. denied by Content v. United States*, 506 U.S. 928 (1992), citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 248-249 (1973); *United States v. Isofia*, 370 F.3d 226, 231 (2d Cir. 2004); *United States v. London*, 148 Fed. Appx. 19, 22 (2d Cir. 2005). Stated another way, a determination must be made as to whether, under a totality of the circumstances, "the consent was a 'product of that individual's free and unconstrained choice, rather than a mere acquiescence in a show of authority.'" *United States v. Garcia*, 56 F.3d 418, 422 (2d Cir. 1995) (internal citations

omitted).

Therefore, in considering the "totality of the circumstances" presented to this Court, I find nothing in the record that would warrant a finding that the defendant's consent to search his apartment was not "a product of his free and unconstrained choice" especially when considering his uncontradicted statement, "go ahead, there is nothing in there."  As a result, the seizure of the rental agreement containing the name "Jerry Cockerton" from the apartment premises, as well as the seizure of the package addressed to "Jerry Cockerton" found in the unlocked closet located in a common hallway, were not in violation of the defendant's Fourth Amendment rights.

It is also pointed out that the defendant has not contested the sworn statement of Special Agent Merker describing the "unlocked closet" as being in a "common hallway" where the package addressed to "Jerry Cockerton" containing the "sham" cocaine was found and seized.  (07-M-98, Docket #1, ¶ 9).

> The test to determine whether a person can claim Fourth Amendment protection in a given place depends on whether the person has a legitimate subjective expectancy of privacy in that area that society is prepared to accept as objectively reasonable.

*United States v. Barrios-Moriera*, 872 F.2d 12, 14 (2d Cir.), *cert. denied* 493 U.S. 953 (1989) (citations omitted).

As the Court of Appeals for the Second Circuit has expressly held:

> [I]t is the established law of this Circuit that the common
> halls and lobbies of multi-tenant buildings are not within an
> individual tenant's zone of privacy even though they are
> guarded by locked doors. (Citations omitted).
>
> *   *   *
>
> Moreover, we have never held that the common areas must
> be accessible to the public at large nor have we required a
> qualified amount of daily traffic through the area as a basis
> for determining that a common area is beyond an
> individual's protected zone of privacy.  (Citations omitted).

*United States v. Holland*, 755 F.2d 253, 255-256 (2d Cir.), *cert denied* 471 U.S. 1125

(1985); *see also United States v. Gray*, 2008 W.L. 2884507 (2d Cir. July 25, 2008);

*United States v. Barrios-Moriera, supra* at 14.


Therefore, it is RECOMMENDED that defendant's motion to suppress the

evidence seized from the premises at 39 Plymouth Avenue be DENIED.


Therefore, it is hereby **ORDERED** pursuant to 28 U.S.C. § 636(b)(1) that:


This Report, Recommendation and Order be filed with the Clerk of the

Court.


**ANY OBJECTIONS** to this Report, Recommendation and Order must be

filed with the Clerk of this Court within ten (10) days after receipt of a copy of this

Report, Recommendation and Order in accordance with the above statute, Fed. R.

Crim. P. 58(g)(2) and Local Rule 58.2.


The district judge will ordinarily refuse to consider *de novo*, arguments,

case law and/or evidentiary material which could have been, but were not presented to

the magistrate judge in the first instance. *See, e.g., Patterson-Leitch Co., Inc. v.*

*Massachusetts Municipal Wholesale Electric Co.*, 840 F.2d 985 (1st Cir. 1988). **Failure**

**to file objections within the specified time or to request an extension of such time**

**waives the right to appeal the District Judge's Order.** *Thomas v. Arn*, 474 U.S. 140

(1985); *Wesolek, et al. v. Canadair Ltd., et al.*, 838 F.2d 55 (2d Cir. 1988).


The parties are reminded that, pursuant to Rule 58.2 of the Local Rules

for the Western District of New York, "written objections shall specifically identify the

portions of the proposed findings and recommendations to which objection is made and

the basis for such objection and shall be supported by legal authority." **Failure to**

**comply with the provisions of Rule 58.2, or with the similar provisions of Rule 58.2**

**(concerning objections to a Magistrate Judge's Report, Recommendation and**

**Order), may result in the District Judge's refusal to consider the objection.**


*S/ H. Kenneth Schroeder, Jr.*
**H. KENNETH SCHROEDER, JR.**
**United States Magistrate Judge**


DATED:      **Buffalo, New York**
            **September 9, 2008**